648 So.2d 331 (1994)
Earl H. HINES, Jr. and Beverly Helms Hines
v.
REMINGTON ARMS COMPANY, INC. and Sinclair, Inc.
No. 94-C-0455.
Supreme Court of Louisiana.
December 8, 1994.
Rehearing Denied January 26, 1995.
*332 John B. Scofield, Patrick D. Gallaugher, Scofield, Gerard, Veron, Hoskins & Soileau, for applicant.
J.B. Jones, Jr., Jennifer J. Bercier, Fred Sinclair, Donald Swanson, for respondent.
HALL, Justice[*].
In this products liability case, the plaintiff, Earl Hines, Jr., was injured when his bench rest target shooting rifle accidently fired into a container of gunpowder, causing it to ignite. Pursuant to a jury verdict finding that neither the rifle nor the gunpowder involved in the accident were defective, the district court entered judgment in favor of the defendants, Sinclair, Inc., the manufacturer of the rifle, Hodgdon Powder Company, Inc. (Hodgdon), the manufacturer of the gunpowder, and Admiral Insurance Company (Admiral), Hodgdon's liability insurer. The court of appeal reversed and entered judgment in favor of the plaintiffs against the defendants. 630 So.2d 809 (La.App. 3d Cir.1993). Hodgdon and Admiral sought writs of certiorari, which we granted in order to review the correctness of the court of appeal decision. 94-0455, (La. 4/7/94); 635 So.2d 1138. Because we find the court of appeal erred, we reverse the court of appeal judgment against Hodgdon and Admiral and reinstate the *333 judgment of the district court as to them. However, because Sinclair did not seek review of the court of appeal judgment, the judgment against Sinclair is not before us and is final. We therefore reverse, in part, the court of appeal judgment.

I.
On February 29, 1984, plaintiff, Earl Hines, Jr., received a custom-manufactured target rifle that he had commissioned from defendant, Sinclair, Inc. The rifle in question was an "accurized" Remington Model 700 bolt-action rifle that had been modified extensively by Fred Sinclair, a gunsmith, and the owner of Sinclair, Inc., in order to be suitable for "bench rest" target shooting. Bench rest target shooting is a highly competitive sport requiring great precision, and as a result, bench rest rifles have an extremely light trigger pull for the purpose of reducing movement of the gun when pulling the trigger. Bench rest rifles are intended to be loaded only when the shooter is at a rifle range, with the gun resting on the bench, pointed down-range.
On the morning of the accident, Mr. Hines picked up his new rifle from a local gun shop, to which Sinclair had it shipped. Upon returning home, Hines went to a room in his home which he had converted into a "reloading room" where his equipment and supplies for modifying and hand loading his cartridges were located, including a reloading bench, several reloading manuals, presses, dies, shells, loaded cartridges, primers, and a large quantity of smokeless gunpowder. Approximately thirty-seven one pound containers of this powder, of various brand names, were stacked along the back of his reloading bench.
When he entered the room, Hines went to his reloading bench and placed the rifle upon the bench with the muzzle pointed at his containers of Hodgdon 4895 gunpowder, a mere six to eight inches away. Hines then loaded a live cartridge into the rifle's chamber, and, according to Hines, upon closing the bolt the gun fired, with [the bullet striking and igniting the Hodgdon powder.[1] A chain-reaction followed that resulted in what the plaintiffs have characterized as an explosion and what the defendants have characterized as a deflagration, or flash fire. As a result of the accident, Hines was severely burned and the resultant stay in the hospital led to further complications, all of which coalesced into permanent and painful personal injuries to Hines. He also suffered extensive property damage to his home as a result of the ensuing fire.
Mr. Hines and his wife, Beverly Helms Hines, timely brought suit for these and other losses against Remington Arms Company, Inc., the manufacturer of the rifle before modification, and Sinclair, Inc., the modifier of the basic Remington rifle, claiming the rifle to be defective. Sinclair, Inc. did not answer the petition and a preliminary default was entered against it. Remington was dismissed on summary judgment. See Hines v. Remington Arms Co., 522 So.2d 152 (La.App. 3d Cir.1988), writ denied, 524 So.2d 522 (La. 1988).
The plaintiffs later amended their suit to add the manufacturer of the powder struck by the bullet, Hodgdon, and its liability insurer, Admiral. The amendment adding Hodgdon and Admiral as defendants was filed after the one year prescriptive period and both Hodgdon and Admiral filed peremptory exceptions of liberative prescription, which were not acted upon by the district court. In the amended petition, the plaintiffs alleged that the powder was defective and claimed that Hodgdon had failed to properly warn of the dangers of the powder. In 1989, Hodgdon and Admiral filed a motion for partial summary judgment, which was treated by the trial court as a motion in limine to exclude the presentation of any evidence or testimony before the jury concerning Hodgdon's alleged failure to warn. The trial court ruled in favor of Hodgdon, prohibiting the presentation of any evidence or remarks in *334 the presence of the jury on the failure to warn claim. Writs to the court of appeal were denied. On the morning of trial, the plaintiffs attempted to set aside this ruling, and again the trial court refused to allow the presentation of evidence on the failure to warn claim, finding that Mr. Hines was a sophisticated user of rifles and gunpowder who had ample knowledge of the dangers of firing a weapon into a container of gunpowder.
After an eight day trial, the jury returned a verdict finding that neither the Sinclair rifle nor the Hodgdon smokeless gunpowder were defective, and judgment was entered in favor of Sinclair, Hodgdon and Admiral accordingly. On appeal, a five judge panel, with two judges dissenting, reversed the district court judgment. 630 So.2d 809 (La. App. 3d Cir.1993).
In reversing, the court of appeal found the class of rifles involved in this accident to be unreasonably dangerous per se and thus found Sinclair to be liable for the plaintiffs' injuries. As to Hodgdon and Admiral, the court of appeal concluded that the trial court erred in excluding all evidence pertaining to the plaintiffs' failure to warn claim and held that evidence concerning Hodgdon's alleged failure to inform consumers of an alternative safer way to store the powder, namely storing the powder in a wooden box, should have been admissible. Upon de novo review of the record, the court of appeal found the warning provided by Hodgdon on its containers of gunpowder to be inadequate, as they made no reference to this alternative safer method of storage, and that such storage method would have prevented the accident. Accordingly, the court of appeal found Hodgdon liable for the plaintiffs' injuries.
The court of appeal then allocated fault as follows: thirty-three percent to Sinclair, Inc.; thirty-three percent to Hodgdon (and its liability insurer, Admiral, up to its $500,000 policy limit), and thirty-four percent to Hines. The court then awarded $2,458,128.92 to Mr. Hines, and $50,000 to Mrs. Hines for her loss of consortium, both awards subject to reduction for the percentage of fault attributable to Mr. Hines. On the basis that Sinclair, as the manufacturer of the Sinclair rifle, is presumed to know of the vices of the product it sells, the court further awarded attorney fees against Sinclair for an amount equal to twenty-five percent of the award. On rehearing, the court of appeal reduced the award to $2,322,450.45.[2]
On Hodgdon's and Admiral's writ application, we granted certiorari to consider the correctness of the court of appeal's decision. 94-0455, (La. 4/7/94); 635 So.2d 1138. Sinclair did not apply to this Court for a writ of certiorari. Thus, the only importance of discussing Sinclair's liability is in relation to Hodgdon's and Admiral's plea of prescription. However, since we find no liability on the part of Hodgdon, it is not necessary to consider their plea of prescription or to discuss Sinclair's liability.

II.
The applicable law in this products liability case is that set out in Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 (La.1986).[3] In order to recover from a manufacturer, the plaintiff must prove that the harm resulted from the condition of the product, that the condition made the product unreasonably dangerous to normal use, and that the condition existed at the time the product left the manufacturer's control. Cosse v. Allen-Bradley Co., 601 So.2d 1349 (La.1992); Reilly v. Dynamic Exploration, *335 Inc., 571 So.2d 140, 144 (La.1990); Halphen, 484 So.2d at 113; Bell v. Jet Wheel Blast, 462 So.2d 166, 168 (La.1985). Under Halphen, there are four categories of unreasonably dangerous products: (1) products unreasonably dangerous per se; (2) products constructed with an unintended condition making them more dangerous than they were designed to be; (3) products with any danger inherent in normal use not known or obvious to the user of which the manufacturer has not adequately warned; and (4) products unreasonably dangerous in design. Halphen, 484 So.2d at 114-15.
Whether a product is unreasonably dangerous, and thereby is defective, is a question of fact to be made by the factfinder. Gilboy v. American Tobacco Co., 582 So.2d 1263 (La.1991); Bloxom v. Bloxom, 512 So.2d 839 (La.1987). The jury found that the gunpowder was not defective.
Reversal of the jury's factual finding should only occur where the factfinder is manifestly erroneous or clearly wrong. Where there are conflicts in testimony, the factfinder's reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the reviewing court may feel its own evaluations and inferences are just as reasonable. However, the reviewing court's function requires more than just a review of the record to find a reasonable factual basis for the finding; it requires a reviewing court to view the record in its entirety to determine whether the jury was clearly wrong. Finally, where two permissible, i.e. reasonable, views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous. Ambrose v. New Orleans Police Dep't Ambulance Serv., 93-3099, 93-3110, 93-3112 (La. 7/5/94); 639 So.2d 216; Stobart v. State, through DOTD, 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978).

III.

A.
The plaintiffs put on no evidence to establish that the gunpowder involved in this accident was unreasonably dangerous per se, nor that it was unreasonably dangerous in design. The jury was not manifestly erroneous in finding the gunpowder was not defective under either of these two theories.
The plaintiffs did present to the jury evidence and testimony asserting that the gunpowder that was struck by Mr. Hines' bullet was defective in composition and manufacture. The plaintiffs claimed that the gunpowder exploded, and that since smokeless gunpowder, like that involved in this accident, is not supposed to explode, the particular container of gunpowder shot by Mr. Hines was defective. The defendants claimed that there was no true explosion, but rather a deflagration, or flash fire, which is expected when gunpowder is ignited.
The plaintiffs presented the testimony of Alfred Brame, who renovated the house after the fire and viewed the house the night of the fire. He testified that the two windows in the reloading room were blown out and the door to the reloading room was blown into the hallway along with the door jam. The plaintiffs also presented the testimony of Jim Latour, a State Farm adjuster who was accepted as an expert in fire investigation. He examined the house the day after the accident and corroborated Mr. Brame's testimony. He was of the opinion that an explosion took place though he admitted that term was generic to him and he did not know the difference between a deflagration and a detonation. Hines testified that there was an explosion which knocked him off his chair. He admitted, however, that he heard no explosion. He stated that to get out of the room, he had to climb over the reloading room door, which was wedged in the hallway. Mr. Hines' wife, Beverly, testified that at the time of the accident she was at the house next door visiting the neighbors and that she did not hear an explosion, and knew of no one in the neighborhood that heard an explosion. The plaintiffs' expert George Greene, who professed to be an expert in analyzing any situation involving product failure, was accepted as an expert in accident reconstruction, failure analysis, and safety engineering. He testified that there was an explosion and not a deflagration, because a deflagration has *336 no blast and is merely a rapid burning which should not blow out the windows or blow off the door. However, he admitted that there was no detonation, and if there had been one, Mr. Hines would have been killed. He also admitted that he could not give a specific reason why the gunpowder may have exploded.
Dr. Ralph Colpitts, who treated Mr. Hines, testified that Hines suffered purely flash burns, there was no penetration wounds nor anything embedded in his skin, no eardrum damage, and no broken bones. Dr. Colpitts testified that he saw no evidence that Mr. Hines had been involved in an explosion. The defendants also presented the testimony of Robert Hodgdon, the president of Hodgdon Powder Company. He testified that Hodgdon performs extensive tests on several samples from each lot of gunpowder it buys for packaging and resale, and if the lot of gunpowder from which the one pound container involved in this accident had varied in any way from the specifications for the smokeless powder or contained any substance which would cause it to explode or detonate, it would have been detected. He pointed out that there have been no reports of problems with any of the other containers of gunpowder which came from the same lot as the one involved here. He further testified that the Bureau of Explosives for the Department of Transportation conducted tests on Hodgdon's smokeless powder in 1984 by igniting the powder; there were no detonations as a result of these tests, but rather, as expected, only big balls of fire. Mr. William Davis testified on behalf of the defendants, and was accepted as an expert in firearms, ammunition, and explosive materials, and has extensive training, education, and experience in this particular field. He testified that gunpowder is extremely flammable, and when ignited is transformed from a solid to a gas, taking up one thousand times as much space as it did before ignition. He confirmed Mr. Hodgdon's testimony that if the powder purchased by Hines, contained some substance that would cause it to explode or detonate it would have been detected in the tests performed by Hodgdon. He testified that a detonation is very loud, consisting of violent shock waves travelling thousands of meters per second and that if a detonation had occurred, Mr. Hines would have been killed. He testified that what occurred here was a deflagration, which is a flame front which burns at inches per second. He further concluded that what happened here was an expected result of the ignition of the powder. The defendants also presented the testimony of Mr. Edward Matunas, a gunsmith, who was accepted as an expert in firearms, ammunition, and reloading. He testified that what happened here is a normal result of igniting gunpowder and there was nothing to suggest the Hodgdon powder was defective.
From the evidence and testimony, it appears that the gunpowder acted as expected under the circumstances. Thus, the jury was not manifestly erroneous in holding the gunpowder was not defective in composition or manufacture.

B.
Finally, the plaintiffs alleged that Hodgdon was responsible for the accident due to its failure to warn of the dangers inherent in gunpowder. As stated earlier, the trial court excluded all evidence on Hodgdon's alleged failure to warn, including Hodgdon's alleged failure to warn of a safer way to store the gunpowder, finding that Hines was a sophisticated user of rifles and gunpowder and was well aware of the dangers of firing a weapon into a container of gunpowder, and that therefore, such evidence was irrelevant. The plaintiffs nevertheless made a proffer of evidence in support of their claim. On appeal, the court concluded the trial court had erred in excluding evidence pertaining to the plaintiffs' claim that Hodgdon had failed to inform consumers of an alternative safer way to store the powder that ignited in Mr. Hines' home. Reviewing the evidence, including the proffered evidence, the court found that the warnings, as they existed at the time of the accident, were not communicated with sufficient clarity to instruct Hines of the dangers involved and his corresponding need to exercise more prudent use of the product, and that Hodgdon had a duty to warn or instruct Hines to store the powder in a wooden box. The court then found that *337 Hodgdon's failure to make this alternative safer method of storage known to Hines was a breach of a duty owed to Hines, and that there was a reasonable relationship between this breach and the plaintiffs' injuries. The court of appeal thus found Hodgdon liable for the plaintiffs' injuries. For the reasons that follow, we disagree with the court of appeal's conclusions.
A manufacturer has a duty to provide an adequate warning of any danger inherent in the normal use of its product which is not within the knowledge of or obvious to the ordinary user. Bloxom, 512 So.2d at 843; Halphen, 484 So.2d at 115; Winterrowd v. Travelers Indem. Co., 462 So.2d 639 (La.1985); Hebert v. Brazzel, 403 So.2d 1242 (La.1981); Chappuis v. Sears Roebuck & Co., 358 So.2d 926 (La.1978). This duty does not encompass dangers that are or should be obvious to the ordinary user. See e.g. Hebert, supra; Butler v. Atwood, 420 So.2d 742 (La.App. 4th Cir.1982). This is particularly so when the user is familiar with the product, making him a "sophisticated user."[4]Johnston v. Hartford Ins. Co., 623 So.2d 35, 37 (La.App. 1st Cir.1993); Home Ins. Co. v. National Tea Co., 577 So.2d 65, 74 (La.App. 1st Cir.1990), affirmed in part, reversed in part (on other grounds), 588 So.2d 361 (La.1991); Duncan v. Louisiana Power & Light Co., 532 So.2d 968, 972 (La.App. 5th Cir.1988); Ducote v. Liberty Mut. Ins. Co., 451 So.2d 1211, 1213 (La.App. 4th Cir.1984). A manufacturer's duty to warn generally includes a duty to provide safe use instructions. Sawyer v. Niagara Mach. & Tool Works, Inc., 535 So.2d 1057, 1061 (La.App. 2d Cir.1988); AMCO Underwriters of the Audubon Ins. Co. v. American Radiator & Standard Corp., 329 So.2d 501 (La.App. 1st Cir.1976); Williams v. Allied Chem. Corp., 270 So.2d 157 (La.App. 1st Cir.1972). See also Duncan, supra; Singleton v. Olin Mathieson Chem. Corp., 131 So.2d 329 (La.App. 3d Cir.1961). However, again, the duty does not require such warnings or instructions concerning dangers that are or should be obvious to the ordinary user. See Sawyer, supra; Duncan, supra; Foster v. Marshall, 341 So.2d 1354 (La.App. 2d Cir.1977); Singleton, supra.
The plaintiffs' first claim is that Hodgdon had a duty to warn of the inherent danger of the gunpowder. We reject the plaintiffs' claim in this regard. It is clear that the dangers of gunpowder, and of pointing a loaded high powered rifle at gunpowder, are well known and obvious to the ordinary consumer, especially one such as Hines, who is a sophisticated user of rifles and gunpowder. Although stating he was not certain exactly what would happen if a bullet was fired into a container of gunpowder, Hines admitted he was well aware of the dangerousness of such conduct. Hodgdon, as a matter of law, had no duty to warn against such action. Further, the label on the gunpowder container, provided ample warning of the flammability and danger of the product.
We now turn to the plaintiffs' other failure to warn claimthat Hodgdon should have warned Hines of a safer way to store the powder, i.e. a wooden box. The plaintiffs' contention emanates from a section contained in a Hodgdon manual which suggests storage of gunpowder in a wooden box, known as a powder magazine. The plaintiffs' expert, George Green, testified that storage in such a box is safer, and probably would have prevented the deflagration or explosion which took place when Hines' gun fired into the container of Hodgdon powder. No mention of this particular storage method was made on the warning label attached to the container of Hodgdon powder struck by Mr. Hines' bullet.
The question we must answer is how far does Hodgdon's duty to warn or instruct extend. We conclude that Hodgdon's warnings were written with sufficient clarity to instruct Hines on the dangers of the gunpowder and the need to exercise prudence in using and storing the powder, and that Hodgdon's duty to warn did not extend to *338 advising or instructing Hines of particular storage methods for the powder.
The danger presented by gunpowder is its high degree of flammability, the very essence of its usefulness. This danger is obvious, particularly to a sophisticated user like Mr. Hines. It naturally follows that any such user is aware of the need to protect the powder from external heat, flames, sparks, etc.... It stands to reason that such user would know that any barrier, such as wood, would provide additional protection and make storage of the powder safer from such hazards. Because of such user's knowledge, and simple common sense, it is not necessary that a gunpowder manufacturer, after warning of the highly flammable nature of the product, further warn or advise of particular methods of storage.
Further, the label on the container of Hodgdon gunpowder that was struck by Hines' bullet contained warnings on the front and back of the can. On the front of the container, next to a big red flame was the following:
DANGER
EXTREMELY FLAMMABLE
PRECAUTION ON BACK OF CAN
On the back of the can was the following warnings:

DANGER!

SMOKELESS PROPELLANT

EXTREMELY FLAMMABLE

Keep away from heat, open flame, and sparks. Store in Cool, Dry Place.

Keep Out of the Reach of Children.

CAUTION
Use this smokeless powder propellant only for loading ammunition in strict accordance with HODGDON POWDER COMPANY loading data for this powder.
Every precaution should be taken for safe handling of these explosive powders. Inspect each container closely semi-annually.... Use this powder only according to our loading instructions. Loading data for any caliber or gauge is available for 25 ¢ and a self-addressed envelope, or our complete loading data manual is available from the dealer selling our powder or from HODGDON POWDER COMPANY.
The warning provided by Hodgdon on its containers included extensive warnings about the flammability and danger of the powder. Thus, consumers were warned of the danger inherent in the product. Further, Hodgdon provided on the container, precautionary warnings of those things that pose a danger to the gunpowder"Keep away from heat, open flames and sparks." It warned that "[e]very precaution should be taken for safe handling of these explosive powders." It also instructed users to "Store in a cool dry place," and to "Keep out of the reach of children." It simply is not necessary to further warn or advise as to particular methods of storage. There are numerous ways these precautions might have been taken, e.g. storing the powder in a closet, storing it in a cabinet, or storing it in a wooden box. Anyone would know that such additional protection would make storage safer, and the fact that Hodgdon provided in its manual a particular way to carry out the precautions warned about on the container, does not create a duty on their part to have put this on the label. Certainly, under the peculiar circumstances of this case, there is no need to warn or advise of a method of storage that would protect against discharge of a firearm from short range into the container.
In our view, the warnings and instructions provided by Hodgdon adequately apprised Hines of the dangers of gunpowder and the precautions that should be taken in relation to its use and storage, and Hodgdon's duty to warn does not extend to warning or advising users of particular storage methods for the powder. Therefore, the jury verdict was correct and the trial court did not abuse its discretion in refusing to allow the plaintiffs to present evidence to the jury on their failure to warn claim, and the court of appeal erred in reversing that judgment.

IV.
Because the gunpowder involved in this accident was not defective under any of the *339 four available theories, the court of appeal judgment against Hodgdon and Admiral is reversed. Sinclair did not appeal the court of appeal judgment against it, and thus, that judgment is final. In view of our finding on the merits of the plaintiffs' claims against Hodgdon, it is not necessary to consider Sinclair's liability as it bears on Hodgdon's and Admiral's plea of prescription.
The judgment of the court of appeal against Hodgdon and Admiral is reversed and the plaintiffs' demands against those defendants rejected. Because the judgment against Sinclair is not before us, it stands.
REVERSED, IN PART.
WATSON and ORTIQUE, JJ., dissent and assign reasons.
LEMMON, J., joins in the opinion and assigns additional reasons.
LEMMON, Justice, joins in the opinion and assigns additional reasons.
The primary safety reason for storing gunpowder in wooden boxes is to provide a degree of protection in the event of sparks or flames in the room.[1] Another reason is to keep the powder cool.
Under the cause-in-fact element of the duty-risk analysis, the manufacturer's failure to warn consumers to store gunpowder in a wooden box was arguably a cause-in-fact of the accident, because the accident perhaps would not have occurred or the consequences been so severe if the powder had been stored in this manner.[2] Nevertheless, under the scope of protection element of the analysis, any duty on the manufacturer to inform consumers regarding this safety measure for storing gunpowder does not encompass the risk that the consumer will fire a bullet into the gunpowder. There is simply no ease of association between the duty which is alleged to have been breached and the injury which occurred in this case.
WATSON, Justice, dissenting.
I respectfully dissent from the majority opinion for the following reasons:

LIABILITY OF SINCLAIR
For the claims against Hodgdon to be timely, it is necessary that Sinclair be liable. Sinclair's liability is obvious because a rifle which fires without trigger pressure is defective. Hines merely attempted to close the rifle's breech when the gun fired. The conclusion is inescapable that the rifle was defective and partially caused the accident.

LIABILITY OF HODGDON
The majority gives scant attention to the chief basis for liability on the part of the powder company. The majority states that there was no duty to warn of the necessity of storage in a particular manner; only a duty to warn that gunpowder is dangerous. Everyone knows that gunpowder is dangerous! Everyone does not know that storage in a wooden box will prevent a rapid burn or deflagration. The manufacturer of a dangerous material has a high duty to warn those buying the product of safe storage methods.
Judge Thibodeaux thoroughly covered the issue of failure to warn and the proper resolution of that issue in favor of liability by Hodgdon. I will take the liberty of quoting at length:
The argument rejected by the trial judge was that Hodgdon knew of, and recommended, a proper method of storing its powder but failed to make this method known to its users. At the time of the accident, Hodgdon published a manual which suggested storing its powder in a wooden box, known as a "powder magazine." This manual was available by request *340 at a cost of $25.00. The label on the canisters of powder made no reference to proper storage methods, nor did it inform the user of the existence of the manual or the instructions therein.
The Hineses introduced evidence of Hodgdon's alleged failure to warn as an offer of proof, outside the presence of the jury. They argue now that they were wrongfully denied the right to present their primary case against Hodgdon because of the exclusion of this evidence. We agree.
* * * * * *
Hodgdon, as manufacturer of the gunpowder, has a duty to warn of dangers inherent in the normal use of the product which are not obvious or known to the ordinary user. Winterrowd v. The Travelers Indemnity Co., 462 So.2d 639 (La. 1985); Halphen, supra. This includes providing instructions to prevent the misuse of its product. Brumley v. Firestone Tire & Rubber Co., 459 So.2d 572 (La.App. 3d Cir.), writ denied, 462 So.2d 1267 (La. 1984). For the warning or instruction to be adequate, it must be expressed with an intensity proportionate to the danger inherent in the product. Ducote v. Liberty Mutual Insurance Co., 451 So.2d 1211 (La. App. 4th Cir.), writ denied, 457 So.2d 15 (La.1984). Our examination of the record reveals that Hodgdon's warnings were not manifested with sufficient clarity to instruct Hines of the dangers involved and the need to exercise more prudent use of the sensitive instrument. See, e.g., Bloxom v. Bloxom, 512 So.2d 839 (La.1987).
There is no duty to warn a user of a danger that is obvious or of common knowledge. Neither is there a duty to warn a user, sometimes defined as a "sophisticated user," who, through his familiarity with the product, is presumed to know its dangers. Whitacre v. Halo Optical Products, Inc., 501 So.2d 994 (La.App. 2d Cir.1987); Ducote, supra, Winterrowd, supra. Hodgdon argues that Mr. Hines is a "sophisticated user" of guns, with enough experience to certainly contemplate the ramifications of firing a rifle into a canister of gunpowder. It argues that the canister labels sufficiently warned of the flammable nature of the product and, furthermore, the product did not react in a way that was unexpected considering the circumstances.
This argument misses the point of the claim. The Hineses sought to prove that Hodgdon knew of a safe method of storing gunpowdera method not common knowledge among users of the productand failed to sufficiently convey this method to its users. The trial judge misconstrued the import of this theory.
In failure to warn cases, there must be a reasonable relationship between the omission of the warning and the injury suffered by plaintiff. Gauthier v. McDonough Power Equipment, Inc., 608 So.2d 1086 (La.App. 3d Cir.1992). Mr. and Mrs. Hines offered evidence of the following: (1) that Hodgdon was aware of a safe storage method for its gunpowder; (2) that this method was not obvious or generally known; (3) that Mr. Hines was not aware of this method; (4) that Hodgdon did not make the information readily available; and, (5) that had Mr. Hines been made aware of the storage method, the injuries he suffered might never have occurred.
The foregoing evidence was sufficient to establish both a duty by Hodgdon and a reasonable relationship between the lack of warning and the injury suffered. The trial judge abused his discretion by excluding the evidence and depriving the Hineses an opportunity to have the jury decide the outcome. It is incumbent upon the appellate court to grant relief where the trial court's abuse of discretion substantially impairs the rights of a party. Guillory v. Guillory, 602 So.2d 769 (La.App. 3d Cir. 1992). For that reason, we reverse.

B. De Novo Review
Where the trial judge makes a consequential error in excluding evidence, the judgment of the trial court should be given no weight. We must, after an independent review of the record inclusive of the excluded evidence, determine the outcome of this case. McLean v. Hunter, 495 So.2d 1298 (La.1986).

*341 The evidence established that it was a Hodgdon powder canister into which Mr. Hines accidentally fired. Defendants did not mount any serious challenge to that contention and, in fact, its own experts indicated that the results would have been much worse had Mr. Hines fired into metal containers holding the powder of other manufacturers. Thus, we turn to the issue of failure to adequately warn.
The focus of the failure to warn evidence was Hodgdon's duty to instruct users in the method of correct and safe storage of its gunpowder. At the time of the accident, the label on a canister of H4895 stated: "Store in Cool, Dry Place." Additionally, Hodgdon produced a manual containing specifications for reloading cartridges. This manual instructed that its powder should be stored in a wooden cabinet, and gave instructions on how to build it. The manual was available at a cost of $25.00. Subsequent to the accident, the canister label was changed to say:
"Read safe usage and storage instructions in our FREE BOOKLET or in our complete DATA MANUAL available from ... HODGDON POWDER COMPANY."
Obviously, Hodgdon found it necessary to inform its users of safe storage instructions as it substantially changed its warning and made the instructions available for free.[1] By doing so, it showed its knowledge of the need for safe storage instructions and it demonstrated the ease and cost effectiveness of supplying such information.
Hodgdon knew of the potential dangers of improper storage or it would never have bothered to provide any instructions. However, it did not adequately convey these instructions to its users, by either direct warning on the label of the canisters or by reference to proper storage instructions, as it did subsequent to the accident.
Mr. Hines did not know and could not have been expected to know the dangers of storing powder in the fashion in which he did. He had seen powder stored in that manner before. Indeed, if he had looked in the Hodgdon manual containing the original storage instructions, he might have seen the picture of a reloading bench with gunpowder stacked along one side in a fashion similar to the way his was.
Mr. Hines owned the Hodgdon manual at the time of the accident but did not use it. It contained no reloading specifications for the cartridges he used. The very fact that he had the manual did not suffice as warning, as there was nothing on the canister or the manual to draw his attention to the need for instructions on safe storage. Moreover, the manual, given the picture of the reloading bench, at best provided conflicting information.
Hodgdon had knowledge of the dangers inherent in the improper storage of its powder yet failed to provide a warning sufficient to relay the information to consumers. Mr. Hines was unaware of the proper storage methods and these methods were not obvious to the general user. Had Mr. Hines stored the Hodgdon powder in a wooden box, the results of the accidental firing of the Sinclair rifle would have been much less severe, if they would have occurred at all. Consequently, we find that Hodgdon is at least partially liable for plaintiffs' damages. Hines v. Remington Arms Co., Inc., 630 So.2d 809 (La.App. 3 Cir.1993), at 815, 816, 817.
Judge Thibodeaux has it exactly right on this issue. I would find that Sinclair and Hodgdon are solidarily liable and I would attribute some measure of comparative fault to Hines.
For these reasons, I respectfully dissent.
ORTIQUE, Justice pro tem., dissenting.
I must respectfully dissent from the majority opinion, having carefully reviewed the rulings of the Trial Judge and the pronouncements of the Appellate Court.
First and foremost, this Court has established that "where the trial judge makes a *342 consequential error in excluding evidence, the judgment of the trial court should be given no weight." Under such circumstances"we must, after an independent review of the record, inclusive of the excluded evidence, determine the outcome of the case." McClean v. Hunter, 495 So.2d 1298 (La. 1986). Whereas the majority opinion states the law and jurisprudence regarding reversal of factual findings by the jury precisely and resolutely, these are not the principles appropriate to an inquiry prefaced on the exclusion of an accepted theory of recovery. As the Appellate Court points out, "the Hineses sought to prove that Hodgdon (the manufacturer of the gunpowder) knew of a safe method of storing gunpowder, a method not common knowledge among the users of the productand failed to sufficiently convey this method to it's users." The jury, if properly instructed, could have determined whether the failure to instruct vitiated the duty to protect the unsuspecting or unsophisticated user of the product, as well as the more sophisticated and creative ones. The factual determination should not be summarily dismissed on the basis of a predisposed judgmental conviction which failed to take into account the reasonable relationship between the lack of warning and the injury suffered. By it's arbitrary exclusion of the evidence, the trial court deprived the plaintiffs of an integral aspect of their cause of action against this manufacturer of an inherently dangerous product. This is error crying out for rectification by an appellate court!
Very appropriately, the Appellate Court reviewed the evidence de novo and concluded:
1. Hodgdon knew of the potential dangers of improper storage or it would never have bothered to provide any instructions.
2. There was nothing on the canister or the manual to draw his (Hines') attention to the need for instructions on safe storage.
3. Mr. Hines owned the Hodgdon manual at the time of the accident but did not use it. If he had looked in the Hodgdon manual containing the original storage instructions, he would have seen the picture of a reloading bench with gunpowder stacked along one side, in a fashion similar to the way his was. And thus the manual provided conflicting information at best.
These factual determinations are inherent in the plaintiffs' right of recovery. The majority opinion does not countenance the jurisprudential basis for this fact-finding evaluation and conclusion by the jury. The error of the trial judge is compounded by the failure of the majority to distinguish between reasonable factual basis and the imperatives of a cause of action.
Consider the rationale of: Stobart ed v. State, through DODT, 617 So.2d 880 (La. 1993); Rosell v. ESCO, 549 So.2d 840 (La. 1989).
Secondly, the majority opinion appears to reach the conclusion that Hines' actions were so irresponsible and so irrational that "he got what he deserved." One cannot help but note several statements which in themselves are valid and are included in the evidence heard by the jury, but which appear to give greater significance to circumstance than to reality.[1] The fact is that until the bullet struck the gunpowder, there could be no "explosion" or "deflagration." Just as dynamite and primer cord can be laid side by side, without any fear of an explosion, the evidence in the instant case unequivocally supports the conclusion that a properly modified version of the Sinclair rifle could be tested for chamber or bore qualities or size, without the firing pin moving forward. This is an irrefutable truth, whether a dummy or a live cartridge was used by the tester.
In reaching the above conclusion, it is appropriate to note that the only evidence before *343 the Court and jury is that the trigger was not touched. Hines was unshakable in his statement that the gun fired upon his closing the bolt. No evidence was presented that contradicted his statement that the trigger mechanism was so "light" that it unexpectedly fired. Au contraire, the pertinent portion of the witnesses' testimony indicate that without touching the trigger, the forward motion of the bolt fired the weapon. Whereas Mr. Sinclair declared that this should not happen with an intended trigger pressure of two ounces,[2] there is equally persuasive evidence that the "trigger pull" on the Hines rifle was modified to less than onehalf ounce. Plaintiff's expert, George Greene, declared that "it was not possible to use a firearm under those conditions." Admittedly Fred Sinclair, in his deposition, stated: "The trigger is exceptionally light. It would not have left my shop in that fashion."[3] But it is clear that he reached this conclusion based on usual practices, not on any record of testingwhich said testing he suggested, "may have been done by himself or by his employee, Tom Meredith." To be so furtive on such an important issue, reduces significantly the probative value of his declaration regarding the quality of his "expert modifications."
Finally, the majority opinion dismisses the plaintiff's claim that the gunpowder was defective and that it exploded, because there was testimony that smokeless gunpowder is not supposed to explode. But even the testimony of William Dane[4] appears to support the conclusion that an explosion took place, given his testimony that "when ignited(the gunpowder)is transformed from a solid to a gas, taking up one-thousand times as much space as it did before the ignition." More importantly, however, was the physical evidence that an explosion took place.[5] There can be no dispute that the door jamb was blown out, even if one doubts that Hines was blown out of the room. The physical evidence of an explosion, witnessed by several who viewed the scene is more convincing and reliableand is not over-come, in my view, by the expert testimony of a "long distance" observer.
So long as our jurisprudence dictates that the manufacturer of a dangerous substance or instrumentality is compelled to warn with a sufficiency so as to express an intensity proportionate to the danger inherent in the product or instrumentality, the careful and meticulous conclusions of the majority of the Third Circuit panel should receive the affirmation of this Court. To do otherwise, does violence to our very rational body of jurisprudence (i.e. duty to act responsibly), that demands that "every act whatever of man that causes damage to another obligates him by whose fault it happened to repair it."
FOR THESE REASONS, I MUST RESPECTFULLY DISSENT.
NOTES
[*] Justice Revius O. Ortique, Jr., retired, participating in the decision by assignment, the case having been argued prior to his retirement.

Judge Melvin A. Shortess, Court of Appeal, First Circuit, sitting by assignment in place of Justice James L. Dennis, not on panel. Rule IV, Part 2, § 3.
[1] The evidence clearly preponderates that the bullet fired by Hines, struck a container of Hodgdon powder. Hines testified that he kept all his Hodgdon powder on one side of his reloading bench, and other types of powder were kept on the other side of the bench. He testified that the rifle was pointed at the same side of the bench as the Hodgdon powder. The defendants did not mount any serious challenge to this version of events.
[2] The court of appeal eliminated the amounts awarded to the plaintiffs for property damage, since they had already been reimbursed by their insurers, State Farm Insurance Co., Inc., and the claim had been subrogated to State Farm. Since State Farm, who had intervened in the suit, elected not to appeal the judgment of the district court, that judgment was final as to State Farm, and the plaintiffs had no right to recover property damages after they had been assigned to State Farm.
[3] Mr. Hines' accident occurred in 1984, well before the Louisiana Products Liability Act became effective on September 1, 1988. 1988 La. Acts, No. 64 (presently found at La.R.S. 9:2800.51 et seq.). The Act affects substantive rights and has accordingly been held not to apply retroactively. Gilboy v. American Tobacco Co., 582 So.2d 1263, 1265 (La.1991).
[4] The trial court judge, in excluding the failure to warn evidence, found Hines to be a sophisticated user of rifles and of gunpowder, and the plaintiffs have not challenged this. We agree with the trial court's determination.
[1] Because wood does not conduct heat or electricity as readily as metal, a wooden box will protect the gunpowder from sparks and will insulate the gunpowder from heat in the event of an open flame in the room. In addition, because ignition converts gunpowder into gases and because of the way in which gases are released from different types of containers, the use of a wooden box will reduce the explosive effect of the gunpowder in the event of ignition.
[2] Cause-in-fact is an issue of fact on which appellate courts should defer to the trier of fact. Here, the jury ruled for the defendant manufacturer.
[1] Evidence of subsequent remedial measures is admissible to prove knowledge, feasibility of precautionary measures, etc. under Toups v. Sears, Roebuck and Company, Inc., 507 So.2d 809 (La. 1987), and LSA-C.E. art. 407.
[1] Examples of these are:

"Bench rest rifles are intended to be loaded only when the shooter is at a rifle range."
"Approximately thirty-seven one pound containers of this powder .... were stacked along the back of his reloading bench."
".... with the muzzle pointed at his containers of Hodgdon 4895 gunpowder, a mere six to eight inches away."
[2] R. at 411.
[3] Robert Hodgdon, President of Hodgdon Powder Company, testified in essence that the gunpowder was incapable of exploding.
[4] Dane was called as "an independent expert in firearms, ammunition and explosives."
[5] The Hodgdon defense is obviously flawed since the lot of gunpowder which "exploded" could not have been tested. To include that it was not defective because a similar lot was not defective "begs the question", in my view.